Peter Bocnuet was elected a commissioner for the trea- ^ sury, and gave his bond for the faithful performance of -qK, duties of his office, according to law. This bond was ° . t recorded m the secretary’s olucc. Alter the expiration oi Bocuuefs time of service, he was re-elected commissioner 1 7 of the treasury,, hut did not give a new bond. During there were several judgments against him; and he gave a mortgage of some property to Greenwood to secure a. just debt. He afterwards died, in arrear to the state, and without leaving assets sufficient to pay all his debts. The state claimed priority of payment over all private creditors, on the general ground of the royal pro-rogative, as well as on the particular provisions ol the statute of 1789 directing the order in which executors ° and administrators should pay the debts due by the de-ccasct** the provisions of that act, executors are dirooted to pay debts due to the state, next after funeral expenses.
The cause was fully argued, but no notes of the ar-gumeiit liave been preserved. Chancellor Rutledge deli-Vercd the following decree of the court: °
* In this case there are three questions to be considered:. ls*-‘ W hether the state retained the common law peroga-live of the king of an unlimited priority of payment of ('c^s 'l'c> before those of a citizen ?
2d. Whether Bocquet’s bond as a commissioner of ^ie treasill'y Recorded in the secretary’s office is a debt on record, and bound his estate from the time he signed it, and for how long a time, if at all?
sd. How far the act, of 1789 will operate so as to post- . ' . . , • pone the judgments and executions obtained against Boc-(IUC*; 'n life-time, and also a mortgage given by him to the defendant Greenwood, to the debt due to the state?
There is no express clause in the constitution of the year 177S, declaratory of the intention of retaining the *451 prerogative now claimed on the part of the state; and it is only from the general words of the 33(1 clause of the constitution, which declares that all laws then in' force shall be continu 'd (unless when temporary) until altered or repealed, that we can even infer that such was the in-tendon; because under that clause, the act of 1712, which makes the common law of force is continued: On the other hand, the idea of the state retaining-this prerogative (however improper it may be) seems to bo altogether a new one; the direction to executors and administrators in the law of 1789, plainly evinces it: and to shew it still more evidently, we need only refer to the constitution, which directs that the commissioners of the treasury shall give bond with approved security; and to subsequent acta, of the. assembly, such as the vendue act, duty act, and paper medium act, which direct, that persons becoming indebted to the state, shall give bonds with security. If this idea of prerogative had prevailed, it is more than probable that no man would have, become security for another, if immediately on his giving a bond, the right or prerogative of the state would so attach upon Ids estate as to prevent him for an unlimited time from disposing of any part of it; and no sale or judgment or execution could divest the state, of its interest therein. lint even if the common law prerogative was retained, yet we are of opinion it cannot affect the defendants in this case, because by the common law the king was entitled to a preference only where the debt was on record, or specialty, in cases where he and the. subject stood in equal degree; which brings ns to the second point. Whether this is a debt on record? That this is not a debt on record is manifest from the legal definition of an obliga!ion by matter of record; which is said to be a writing obligatory, acknowledged before a judge or other officer having authority for that purpose, and enrolled in a court of record. This bond it is true is recorded in the secretary’s office; but that does not make it a record in the legal acceptation of the word. It is not even directed by the constitution to be recorded; it was done merely for security from the chance of being lost or destroyed by lire1: *452 as some other bonds to the state are particularly directed by law to be recorded. Any person having the bond of another may record it in the secretary’s office, but that wp] no|; majie ^ a record, which would bind the debtor’s estate, and yet it might with equal propriety bo insisted 011^ ag jn ^j1(} prescilt case. We can consider it therefore in no other light than a penal bond, on which nothing is immediately due, nor will the penalty at law be recoverable before the condition is broken; and it will even then have no binding efficacy before judgment has been regularly obtained. We are further of opinion that this bond can only be obligatory for such defalcations as may have been incurred during Boquet’s continuance in office, under his first appointment; because his being again elected by the legislature was a new act. It was a new legislature; he received a new commission; ho took the oath anew; and the executive ought to have taken a new bond. So likewise on his second election, it was a new house of legislature; another governor; he had a new commission, and took the oath again. Though the same person, he was a new officer, and the constitution required all those acts to be done each time; they ought to have been done and we must consider them as done. If they were not, there is no blame imputable on the defendants. If the public sustains a loss, the censure must fall on those, whose duty it was to have taken care of the interest of the state. The neglect of doing what ought to have been done, c-annnot revive or give efficacy to a bond for a longer period than it was originally intended to be binding. This case is altogether different from that of the deputy post master: lie v/as continued in office under the original appointment by the person who first appointed him. It may be worthy of observation, that as by the present constitution the commissioners of the treasury are not obliged to give bond with security, and we do not know of any law which directs it, whether it would not be expedient for the legislature to be move explicit on this subject by-passing a law declaring particularly in what-cases the state shall be entitled to a. preference of private creditors.
*453 As to the third point, how far the act of 1789 will operate so as to postpone the executors of the defendant, and invalidate the mortgage of Bocquet to Greenwood, we must observe that this act is directory to executors and administrators in the disposing of the assets of the deceased; and therefore if they should administer them contrary to the direction of that law, and the state recei ves an injury, they might be liable to answer in an action for devastavit. In the present case there are no executors or administrators. This court lias no right to assume the power of executor or administrator; nor if we were inclined to it, docs there appear to be any personal assets over which the court could have any control: and it is only with such assets that executors would have a right to intermeddle. As the effects were all assigned in Bccquct’s lifetime and not only deliv ered to, but actually levied on by the sheriff, the property in the goods was thereby totally divested out of Bocquet in his lifetime; nor could his executors have taken it without being liable to an action by the sheriff. He iras since sold it, and is compellable to pay over the money to the creditors on those executions, for we cannot presume, that the legislature intended in the very general directions to executors respecting payment of debts due the public, (by a side blow’) to overset the whole common and statute law doctrine concerning the binding efficacy of executions, A variety of cases wore cited from Bunbury and Parker's Reports to shew that when an extent at the king’s suit and an execution for the subject were issued, though the extent was last it should be preferred; that is upon the established principle of the common law, that when the king and the subject stand on equal ground, the one having an extent, and the other an execution, the king should have the preference. But it is indispensably necessary that the king’s debts should be proved in a court of record before an extent can issue. 11‘ judgment and execution had been obtained against Bocquet on tiie bond in question, the cases would have applied, but on the contrary no such proceedings have keen had. It was also asserted that oven a simple contract debt due the king should *454 have the preference to a bond due to the subject; and fur* ther that the lands of the king’s debtor aré liable from the time of contracting the debt, though not of record, and a case was quoted from Parker’s Reports for that purpose. Upon looking however into that case it does not warrant the assertion; they were, the arguments of counsel, and the court expressly declined giving any opinion on those points, because, they did not then come judicially before them. Bocquet’s bond not being considered as a record, and therefore not binding on his estate, in the first instance; he had undoubtedly a right to mortgage the lands to the defendant Greenwood, subject however to any prior incumbrances; after discharging which they will be liable to satisfy Greenwood’s demands. Upon the whole, the court are of opinion, and decree, that the injunction be dissolved and the bill dismissed, but without costs, upon the principle that the state pays no costs.